JOHN H. TUCKERMAN ET AL. v. THE STEPHENS AND CONDIT TRANSPORTATION COMPANY.

1. Common carriers are liable for all losses, except those arising from the act of God, or the public enemy.

2. The term " dangers of the sea only excepted," in a bill of lading or a contract for the safe delivery of property, *held* to mean " those accidents peculiar to navigation that are of an extraordinary nature, or arise from irresistible force or overwhelming power, which cannot be guarded against by the ordinary exertions of human skill and prudence."

3. Where defendants are charged as carriers under such contract, or as common carriers, and it appears from the clear weight of evidence that the loss was occasioned, not by the violence of the elements, but by the want of ordinary exertion of human skill and prudence, a verdict rendered for defendants will be set aside.

---

In case. On rule to show cause why a new trial should not be granted.

The suit was brought to recover of the defendants the value of two hundred tons of pig iron, which, for a consideration, they undertook to deliver to the plaintiff, at Sau-

gerties, N. Y., and failed to do so. The defence set up was, that the vessel in which the iron was shipped, foundered in a storm on its way up the Hudson river, and the iron was thereby lost. The jury gave a verdict for the defendants, and a rule to show cause why the same should not be set aside, was granted.

The case was argued by—

*C. Parker* and *A. Q. Keasbey* for the plaintiff.

*T. N. McCarter*, for the defendants.

The opinion of the court was delivered by

VREDENBURGH, J. On the eighteenth of November, 1865, the plaintiffs delivered to the defendants, at Newark, N. J., two hundred tons of pig iron, upon the trust that they, the defendants, would ship it by water, for one dollar and fifty cents per ton, freight, from Newark aforesaid, to Saugerties, N. Y., and there redeliver it to the plaintiffs. The defendants have not so redelivered it. Their excuse is that the vessel in which the iron was shipped foundered on its way up the Hudson river, in a storm, and the iron was lost, so that redelivery became impossible.

The question is, whether the foundering of the vessel in that storm, under all the attending circumstances, was a legal excuse to the defendants for non-delivery.

If the defendants were of that class of bailees called common carriers, then their contract raised by the policy of the law was, and their only excuse could be, that redelivery had become impossible by the act of God, or of the public enemy.

If the defendants were private carriers for hire, then what should be an excuse depends upon their special contract, if they made one.

The proof shows very distinctly that the defendants were common carriers from Newark to New York city, and that they agreed, in this instance, to carry the iron beyond the city

of New York, to wit, to Saugerties, and redeliver it to the plaintiffs there. This constitutes them common carriers for the whole distance. *Willcox* v. *Parmlee*, 3 *Sand. Sup. C. R.* 610 ; *Fairchild* v. *Slocum*, 19 *Wend.* 329 ; *Muschamp* v. *Lancaster Railway Co.*, 8 *Meeson & W.* 421.

But suppose that the defendants are only private carriers, how stands their contract as to their excuse for non-delivery ?

Their bill of lading, which will then be their special contract, reads as follows :

"Shipped, in good order and condition, by the Stephens and Condit Transportation Company, on board the barge Mayo, for this voyage, now lying at the port of Newark, and bound for Saugerties, N. Y., two hundred tons of pig iron, and are to be delivered in like order and condition at the port of Saugerties, (the dangers of the seas only excepted,) unto Tuckerman & Co., paying freight $1.50 per ton. Dated eighteenth November, 1865."

So that, if the defendants were private carriers, their only excuse was that redelivery became impossible by the dangers of the seas. The phrase is, "the dangers of the seas *only* excepted."

The admitted fact is, that this barge belonging to the defendants, with this iron on board, sunk on the twenty-first of November, 1865, about three o'clock in the morning, as she was being towed by the steamer Herald, having twenty-five other similar boats in tow, as she was passing through the upper part of the Tappan Sea. She was the only boat of all the tow that foundered.

The excuse is, that the barge foundered in this storm, and so perished by the perils of the seas.

If she sunk by the violence of the storm, it makes no difference whether we say she perished by the act of God, or by the perils of the seas, as they are only different words to express the same act of power.

In that regard, the contract raised by the policy of the law, in respect to common carriers, is precisely the same as

that here made by the express contract of the private carrier.

So that the question here is, was this storm such an act of God, or such a danger of the seas, as to excuse the defendants for non-delivery.

It has not been contended that this storm was so violent as to founder this vessel by the act of God, and it is manifest that it could not be successfully so contended. But it has been contended that it was so violent that the vessel foundered by the dangers of the seas.

This raises two questions.

*First.* What is the legal meaning of the phrase, " dangers of the seas ?" This is well and truly defined in the charge to the jury.

The court there says : " By the dangers of the seas is meant those accidents peculiar to navigation, that are of an extraordinary nature, or arise from irresistible force, or overwhelming power, which cannot be guarded against by the ordinary exertions of human skill and prudence."

Under this definition, it is nothing to say that this vessel foundered in a storm, for there is nothing in that of an extraordinary nature, but on the contrary, nothing can be more ordinary. But the defendants must go on further, and prove, *secondly,* that this particular storm was of such irresistible force and overwhelming power as that it could not have been guarded against by the ordinary exertions of human skill and prudence.

The Mayo might have perished by the violence of Providence, or by the carelessness of man. Which does the evidence show? The jury have said the former. Where is the weight of the evidence? The only seas the Mayo had to encounter was the Tappan Sea, and she foundered just as she got through it. There is no pretence that she went down in any sudden squall. The wind, what there was, was a steady northeast one, and coming from the quarter the most favorable for the vessel's safety. The wind did not capsize her, or even make her roll. There is no evidence that she

Tuckerman et al. v. Stephens and Condit Transportation Co.

was crushed, or even damaged, by any other part of the tow, or by any other vessel, that she struck on any rock or sand-bar. There were twenty-five other vessels of the same class in the tow, and owing to her position, she, of all the others, must have had the smoothest water, and yet she, of all her companions, was the only one which sunk, or was in the slightest degree damaged. Nay, of all the hundreds of vessels, of all descriptions, on the Hudson river that night, we do not hear of any one damaged, much less destroyed, save only the barge Mayo. Whilst hundreds of other craft —barges, coal boats, canal boats, of all kinds and descriptions —passed through the same river, in the same storm, without showing any sign of injury, what special Providence struck the Mayo?

Let us look for a moment upon the evidence of the irresistible force and overwhelming power of this storm, but which spent its fury, so far as the evidence goes, only upon the Mayo. She started from New York city on the twentieth November, 1865, about six P. M., in tow of the steamer Herald, which had in tow also twenty-five other boats, including barges, canal, and coal boats. The Tappan Sea had been pretty well passed, when the vessel sunk, about three o'clock A. M.

Miles McKeon, the master of the barge, says: "The wind was at the northeast at the time; there was a heavy sea on all night; the wind blew and it rained. She did not roll more than ordinary; there was some blow on that evening; it came on to blow heavier, a steady blow, about nine o'clock. We went on perfectly safe, till about three A. M.; there was then still a heavy sea; there was some blow that evening; it increased some; it came on to blow heavier, whether suddenly or gradually, I don't know; I went to bed about twelve o'clock; I thought there was no need of my staying up; I thought the boat was *perfectly* safe; she did not roll unusually."

Now this is the strongest evidence there is on the part of the defendants that this storm was of such irresistible force

and overwhelming power that it could not have been guarded against by the ordinary exertions of human skill and prudence.

And yet, what kind of a storm must that have been, in which the main witness says that he was the captain of the vessel, and that he thought there was no need of his staying up, and in which he thought the boat was perfectly safe, and in which the coal boats did not even roll, and he went to bed. But again, the captain says the vessel was manned by two men, a boy, a passenger, and himself. The boy went to bed before the captain did. The only knowledge Anderson, the passenger, had of navigation, so far as appears by the evidence, was that he knew how to cut hay on the salt meadows. But, besides this, he went to bed at the same time as the captain. So that the only exertions of human skill and prudence left to guard against the irresistible force and overwhelming power of this storm, from twelve till three o'clock, when she sunk, were what the captain calls the two deck hands. By twelve o'clock the storm had become so violent that all the officers thought it was time to go to bed, and did do so, and slept soundly until they were roused by one of the deck hands exclaiming that the boat was sinking. As to the two deck hands, one of them says he was no seaman, and there is no evidence that the other was. They appear to have been left on deck, without any special instructions, and merely because there was no other place for them to sleep, and which accounts for them waking up as the boat was going down. The deck hand, Conner, is the only one of the whole flotilla who was present and speaks of what took place for the three hours previous to her foundering, and he does not pretend to name any peril of the seas causing the accident. He don't pretend that the storm got any more violent; that the barge rolled in a heavy sea; that she was crushed or damaged by two of the other vessels. He don't pretend to give us even a guess how or when the leak was caused. He only says that she filled and sunk.

Mr. Rogers, the captain of the tow, says: "The barge

sunk about three A. M.; the storm was a severe northeast storm, *likely* to produce dangers in the navigation." We see how very cautiously the captain speaks. He says " that the storm was *likely* to produce dangers in navigation." But is not water itself likely to produce dangers in navigation ? No navigation can be entirely exempt from danger, unless one can manage to navigate entirely on dry land. He says that " the Tappan Sea had been pretty well passed when the vessel sunk. The wind continued to increase till about two o'clock. I went to bed about half-past two; the danger was over, I thought; the worst was between twelve and two o'clock; I supposed it was not necessary for me to be around any longer."

So that the case presents the singular anomalies that as the winds rose, and the dangers increased, all hands went to sleep, and the barge, not to be behind the officers, as long as the winds blew and the waves beat, got along excellently well, but as soon as the winds ceased, and the water became smooth, and the officers and crew woke up, she went down.

Would not the evidence be as strong that this vessel perished by the perils of the sea, if she had foundered in a storm on the Morris canal ?

To my mind, the overwhelming weight of the evidence is that the barge Mayo perished, not by the violence of the elements, but by the want of the ordinary exertions of human skill and prudence, and that the verdict should be set aside.

AFFIRMED, 4 *Vroom* 543.